IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Christopher O., | ) |
|     *Plaintiff*, | ) |
| | ) Case No. 3:21-cv-50181 |
| v. | ) |
| | ) Magistrate Judge Lisa A. Jensen |
| Kilolo Kijakazi, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
|     *Defendant*. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christopher O. brings this action under 42 U.S.C. § 405(g) seeking a remand of the decision denying him supplemental security income.[2] For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded.

**I. Background**

In September 2018, Plaintiff filed an application for supplemental security income alleging a disability beginning on August 7, 2018, because of bipolar disorder, depression, anxiety, gout, and arthritis of the knee. R. 130, 312. He was 44 years old at the time he filed his application.

In June 2020, Plaintiff and a vocational expert ("VE"), Michelle Peters-Pagella, testified at a hearing before an administrative law judge ("ALJ"). The same ALJ held a second hearing in October 2020 where a second VE, Dr. Craig Johnston, testified. The ALJ issued a decision in December 2020, finding that Plaintiff was not disabled. R. 16-27. The ALJ found that Plaintiff had the following severe impairments: obesity, obstructive sleep apnea, gout, right knee arthritis,

---

[1] Kilolo Kijakazi has been substituted for Andrew Marshall Saul. Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

1

posttraumatic stress disorder, depression, and anxiety. The ALJ determined that Plaintiff's impairments did not meet or medically equal a listed impairment. The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light, unskilled work with certain restrictions. The ALJ determined that Plaintiff had no past relevant work, but there were other jobs that existed in significant numbers in the national economy that he could perform, including packer, sorter, assembler, and cashier.

Plaintiff appeals the ALJ's decision, arguing that the ALJ erred in relying on the VEs' testimony to find that there were a significant number of jobs in the national economy that Plaintiff could perform. Plaintiff also argues that the ALJ failed to properly consider his obesity and makes a constitutional challenge to the authority the ALJ and Appeal Council had to adjudicate his claim. Because this Court finds that the ALJ's step five determination requires a remand, this Court will focus on the evidence relevant to the ALJ's evaluation of this issue in the discussion below.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citations omitted). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's

determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

### III. Discussion

Plaintiff argues that: (1) the ALJ failed to properly consider his obesity in the RFC; (2) the ALJ made a step five determination that was not supported by substantial evidence; and (3) his constitutional rights were violated when the ALJ and the Appeals Council adjudicated his claim. The Court agrees that the ALJ's determination at step five requires a remand. Accordingly, the Court will not address Plaintiff's remaining arguments.[3]

As to the ALJ's step five determination, Plaintiff argues that the ALJ improperly relied on the testimony from the VEs to find that a substantial number of jobs exist that Plaintiff can perform because they failed to establish the sources and methods used to determine their job numbers. Specifically, Plaintiff challenges the reliability of the VEs' use of national job numbers for a broad industry category to determine the number of jobs for a specific DOT code. The Commissioner argues that the second VE, Dr. Johnston, fully explained how he used statistics for broader categories of job codes and his own experience to determine the number of jobs available to Plaintiff.

The Commissioner has the burden at step five to show that work exists in significant numbers in the national economy. 20 C.F.R. § 416.960(c)(2); *see Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). "A VE's testimony can satisfy this burden only if that testimony is *reliable*." *Overman*, 546 F.3d at 464 (emphasis in original); *see Chavez v. Berryhill*, 895 F.3d 962,

---

[3] Although Plaintiff initially challenges the ALJ's consideration of his obesity in the RFC, Plaintiff abandons this argument in his reply brief. Therefore, this argument is forfeited. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (explaining that failing to respond to an argument in a response brief results in waiver). However, Plaintiff should raise any issues related to obesity with the ALJ on remand.

3

969 (7th Cir. 2018) ("[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability."). Accordingly, "an applicant may probe the strength of testimony by asking an expert about (for example) her sources and methods—where she got the information at issue and how she analyzed it and derived her conclusions." *Biestek*, 139 S. Ct. at 1156 (internal quotation marks and citation omitted). "And when, as here, the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a 'reasoned and principled explanation' of the methodology she used to produce the estimate." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) (citing *Chavez*, 895 F.3d at 970).

Before the first hearing, Plaintiff's counsel submitted a letter to the ALJ requesting that the VE produce at the hearing documents she relied upon in forming her opinions. R. 413-18. Plaintiff's counsel argued that Ms. Peters-Pagella was not qualified as a labor market statistician to make the extrapolations required to support the job numbers. Despite this request, Ms. Peters-Pagella did not have her supporting materials available at the hearing when she testified. R. 432.

At the first hearing, Ms. Peters-Pagella testified that given Plaintiff's age, education, work experience, and RFC, there were three jobs available to him: packer (DOT 559.687-074) with 96,000 jobs nationally, sorter (DOT 922.687-086) with 55,000 jobs nationally, and assembler (DOT 706.684-022) with 74,000 jobs nationally. R. 63-65. When questioned by Plaintiff's counsel, Ms. Peters-Pagella testified that her job numbers were not specific to the Dictionary of Occupational Titles ("DOT") job codes she identified for light, unskilled jobs. R. 66-67. Ms. Peters-Pagella explained that to formulate her job numbers, she used SkillTRAN and OccuBrower Pro, which utilized statistics from the Bureau of Labor Statistics. Ms. Peters-Pagella acknowledged that SkillTRAN utilized broader Occupational Employment Statistics ("OES")/Standard

Occupational Classification ("SOC") categories. Each of these categories encompass multiple DOT job codes and multiple levels of exertion. Ms. Peters-Pagella testified that the SOC category for packer contained 782 DOT job codes with approximately 160 of those representing light or sedentary, unskilled jobs. R. 72-73. She testified that she relied on SkillTRAN to determine the percentage rates in which the DOT jobs exist in the national economy. Counsel asked Ms. Peters-Pagella multiple times to explain her methodology for determining the numbers of jobs available for a specific DOT code. However, Ms. Peters-Pagella could not explain her calculations. Instead, Ms. Peters-Pagella testified that she generally relied on Bureau of Labor Statistics, along with her education, training, and 25 years of experience with direct job placement and labor market research. The ALJ stopped counsel's cross-examination short due to time constraints and offered the opportunity to file a post-hearing brief regarding Ms. Peters-Pagella's testimony.

In the post-hearing brief, Plaintiff's counsel outlined his objection to the reliability of Ms. Peters-Pagella's job numbers because she provided no explanation of her methodology for using SkillTRAN and SOC categories to identify job numbers for specific DOT codes. R. 428-33. Plaintiff's counsel also attached data from SkillTRAN showing much lower job numbers than Ms. Peters-Pagella testified were available for specific light, unskilled jobs.

The ALJ held a second hearing to receive testimony from a different VE, Dr. Johnston. The ALJ questioned Dr. Johnston using the same hypotheticals utilized in the first hearing. Dr. Johnston testified that three jobs were available: a hand packager (DOT 753.687-038) with 237,000 jobs nationally, a sorter (DOT 739.687-102) with 77,000 jobs nationally, and cashier (DOT 211.462-010) with 585,000 jobs nationally. Plaintiff's counsel cross-examined Dr. Johnston extensively about the sources and methodology he utilized to produce his job numbers. Dr. Johnston testified that he used SkillTRAN and Job Brower Pro to formulate his job numbers. R.

5

93, 99. Dr. Johnston acknowledged that SkillTRAN utilized OES/SOC categories, which contain multiple DOT codes. He explained that, for example, the OES category for hand packager contained 59 DOT codes. Of those codes, 25 were light, unskilled work. Dr. Johnston explained that he typically divides the total number of jobs in the broader SOC category by the number of DOT job codes in that category, known as the equal distribution method. Dr. Johnston explained that "really is often the best we can do." R. 116. Dr. Johnston would then "go the extra step and do labor market surveys." R. 97, 116. Dr. Johnston would typically call employers to ask about the requirements for certain jobs and determine if certain DOT codes still exist. R. 116, 119. Dr. Johnston stated he was using the generally accepted RAPEL method. R. 96. However, Dr. Johnston was only able to cite to one of the factors in that method, namely consideration of the labor market. R. 96.

As Plaintiff's counsel attempted to establish the basis for the VE's job numbers, the ALJ again cut counsel's cross-examination short due to time constraints and directed counsel to file a post-hearing brief with any objections. In response, Plaintiff's counsel requested copies of Dr. Johnston's supporting data for the three jobs he cited and leave to submit supplemental interrogatories for Dr. Johnston to answer. R. 120-21. The ALJ denied counsel's request and told him to hire his own vocational expert to counter Ms. Peters-Pagella and Dr. Johnston's testimony.

Plaintiff's counsel filed a post-hearing brief, again objecting to Dr. Johnston's job numbers because he failed to explain how he used his experience to determine the numbers of jobs available for the DOT codes cited. R. 442-47.

The ALJ ultimately relied on the VEs' testimony to conclude that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. R. 26. The ALJ found that "Dr. Johnston did nothing short of confirming the authenticity of Peters-Pagella's

opinion and even in two instances expanding her job numbers." R. 26. The ALJ reasoned that Dr. Johnston garnered the job numbers from authoritative and widely accepted sources like SkillTRAN, Bureau of Labor Statistics, and Occupational Employment Surveys. The ALJ noted that Dr. Johnston also used SOC codes, the DOT, the Selected Characteristics of Occupations, and his own labor market surveys. The ALJ also stated that Dr. Johnston used the generally accepted RAPEL method, which considered the following five factors: (1) rehabilitation plan; (2) access to the labor market; (3) placeability; (4) earning capacity; and (5) labor force participation. R. 26. The ALJ also found that Plaintiff's counsel did not offer a VE to rebut Ms. Peters-Pagella and Dr. Johnston's testimony.

As outlined above, the ALJ was fully aware of counsel's concerns about the VEs' methodology for producing job numbers. Yet, contrary to the Commissioner's argument, Ms. Peters-Pagella and Dr. Johnston never fully explained their methodology for determining the number of jobs when comparing SOC and DOT codes. *See Chavez*, 895 F.3d at 969 (noting the "information loss" that results from the "many-to-one mapping," between the DOT titles and SOC codes, which results in an estimate of existing jobs that "may deviate significantly from the actual number of existing positions") (citation omitted). The Commissioner all but concedes that Ms. Peters-Pagella's testimony was not reliable by making a harmless error argument in light of Dr. Johnston's supplemental testimony. Def.'s Resp. at 15, Dkt. 25.

As for Dr. Johnston's testimony, he too relies on SkillTRAN but goes the "extra step" of using labor market surveys to confirm the job numbers for a representative DOT code. But it remains unclear how Dr. Johnston utilized these surveys to determine if the equal distribution method among the DOT codes is an accurate representation of actual jobs. Dr. Johnston testified that he compiled data on the requirements for specific jobs to determine if certain DOT codes

7

should be eliminated. But even if certain DOT codes were eliminated, Dr. Johnston offered no explanation as to why the DOT codes that remained would be evenly distributed. Dr. Johnston's explanation was as follows:

> And basically, what I do, is I find after doing my labor market survey, I take a look at my numbers. And I say are these truly evenly distributed across the light unskilled, light semiskilled, sedentary semiskilled, etc., etc. category. If they are, then I feel confident that using the even distribution methods holds for that particular OES group. If I didn't feel confident, then I would come back and explain. You know, I'd give a different number, and I would explain why.

R. 124. Dr. Johnston did not explain how he analyzed this evidence to "give a different number" when necessary. Nevertheless, over counsel's objections and after denying the request for supporting data, the ALJ unquestionably relied on the VEs' ultimate job numbers.

Even though the ALJ credited Dr. Johnston for using the RAPEL method, Dr. Johnston provided no explanation as to how he utilized this method other than to rely, in part, on his own labor market surveys. Dr. Johnston makes no attempt to explain what factors in the RAPEL method he found pertinent and how he weighted them in coming to his conclusions. The ALJ attempted to clarify the job numbers at a supplemental hearing, but Dr. Johnston's testimony remained insufficient for the ALJ to determine whether his methodology for estimating job numbers according to the DOT was sufficiently reliable. *See Tolbert v. Berryhill*, 17 CV 50137, 2018 WL 6725876, at *3 (N.D. Ill. Dec. 21, 2018) (remanding where the "VE did not describe any precise method she used to determine her job numbers from the Bureau of Labor Statistics or explain how she was able to determine what would be 'representative' of a specific DOT code"); *Chavez*, 895 F.3d at 968 (stating that job-numbers estimates must be based on reliable methods).

Although a VE is not always required to produce supporting data for their conclusions, "[i]n some cases, the refusal to disclose data, considered along with other shortcomings, will prevent a court from finding that 'a reasonable mind' could accept the expert's testimony." *Biestek*,

8

139 S. Ct. at 1156 (internal quotation marks and citation omitted). Here, considering Dr. Johnston's conclusory testimony about the basis for his job numbers in conjunction with the ALJ's denial of the request for supporting data and further cross-examination on the topic, this is not the "reasoned and principled explanation" required to find Dr. Johnston's methodology reliable. *See Chavez*, 895 F.3d at 970. Without further explanation or supporting data, Dr. Johnston's testimony alone does not constitute substantial evidence to support the ALJ's determination that Plaintiff can perform a significant number of jobs in the national economy. The ALJ was only entitled to accept the VEs' testimony if reliable. Accordingly, the ALJ's step five determination is not supported by substantial evidence.

In remanding this case, the Court is not indicating that there is no work in significant numbers that Plaintiff can perform. Rather, the basis for the VEs' job numbers should be explored more thoroughly for "a fulsome description of the data and methodology on which the expert relies" so the ALJ can make a step five determination that is based on substantial evidence. *Biestek*, 139 S. Ct. at 1158 (Sotomayor, J., dissenting). Plaintiff's concerns relating to the VEs' job numbers should be considered in a comprehensive analysis on remand. The Court is sympathetic to the ALJ's time constraints in this case when attempting to lay the foundation for a VE's job numbers. However, if the VE produced the supporting data prior to the hearing, this could resolve counsel's concerns about the VE's methodology or at least counsel's questions would be more targeted. In any event, producing the supporting data would be a best practice. *See Biestek*, 139 S. Ct. at 1155 ("Of course, the [vocational expert's] testimony would be even better—more reliable and probative—if she had produced supporting data; that would be a best practice for the SSA and its experts."). Plaintiff's counsel should again raise all these issues with the ALJ on remand, both in

9

a pre-hearing brief and at the administrative hearing. Failure to explicitly raise these issues may result in a waiver if this case is again appealed to this Court.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and the Commissioner's motion is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceeding consistent with this opinion.

Date: August 1, 2022        By:    *Lisa A. J.*
                                              Lisa A. Jensen
                                              United States Magistrate Judge